NOT DESIGNATED FOR PUBLICATION

Nos. 123,626
123,627

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of
M.O. and A.O., Minor Children.

MEMORANDUM OPINION

Appeal from Miami District Court; AMY L. HARTH, judge. Opinion filed October 29, 2021.
Affirmed.

*Geri L. Hartley*, of Hartley Law Group, LLC, of Paola, for appellant natural mother.

*Elizabeth H. Sweeney-Reeder*, county attorney, for appellee.

Before SCHROEDER, P.J., WARNER and ISHERWOOD, JJ.

PER CURIAM: Following an evidentiary hearing, the district court terminated
Mother's parental rights to her two children, M.O. and A.O., finding that Mother was
unfit to parent the children because she had not made reasonable efforts to adjust her
conduct and that termination was in the children's best interests. Mother challenges both
determinations. She asserts her completion of her reintegration case plan undermines the
court's unfitness finding, both relating to her past conduct and in the future. She also
contests the best-interests finding, arguing that the limited visitation time imposed by the
Kansas Department for Children and Families (DCF) hindered her ability to form a closer
bond with her children. After carefully reviewing the record and the parties' arguments,
we find the district court's decision is reasonable and supported by the record. We
therefore affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

In July 2018, M.O. and A.O.—then approximately 18 months and 6 months old—were placed in protective custody after A.O. was hospitalized for unexplained first- and second-degree burns. The State filed petitions claiming both children were in need of the State's care, and the children's parents stipulated to the adjudication of this point. The court approved the dispositional case plan in October 2018 with the goal of reintegration. The plan was revised seven months later to reflect concurrent goals of adoption and reintegration. In October 2020, about 27 months after the case was filed, the State sought to terminate Mother's and Father's parental rights. Father voluntarily relinquished his rights. The district court held an evidentiary hearing concerning Mother's status in December 2020.

Mother's reintegration case plan included tasks such as submitting to drug tests; maintaining stable income, housing, and transportation; completing a mental health and parenting assessment; and attending parenting classes. She largely completed these tasks by the termination hearing in December 2020. Mother did not use drugs, and she found and maintained a part-time job. Though anxiety prevented her from driving, friends and family could drive her when needed. And in 2020, she finished the parenting assessment and parenting classes, found adequate housing, and despite some confusion, completed a second mental health assessment and began attending recommended therapy.

Despite these strides, the termination hearing primarily focused on whether Mother *timely* completed three tasks: finding housing, finishing parenting classes and a parenting assessment, and attending therapy. In other words, though Mother eventually adjusted her circumstances to comply with the case plan, had her efforts demonstrated a decision to prioritize her role as a parent for M.O. and A.O.?

When the case began, Mother and Father lived in an apartment in Osawatomie. To begin visiting M.O. and A.O., each parent was required to submit two clean urinalyses. Mother did so and began supervised visits at the Osawatomie DCF office in September 2018, while Father's drug use prevented him from visiting the children. But because Father and Mother lived together, Father's continued drug use prevented Mother from visiting with the children in her apartment when Father was present. Throughout the case, Mother's caseworkers explained that if Father continued using drugs, she would need to find independent housing in order to have custody of her children. Mother recognized this early on, stating she would move if she could not help Father address his addiction.

In mid-2019, Mother began to discuss housing with her caseworker. She applied at a few locations, including a homeless shelter in Paola, but her income and desire to stay in Osawatomie limited her options. Though Mother worked part time throughout the case, her child support obligations significantly reduced her paychecks. Her caseworker encouraged Mother to work full time and helped her obtain information on how to request a reduction of these payments, but it is unclear whether she submitted the paperwork. And though she reported starting a second job, she was let go shortly after beginning because she could not provide her original Social Security card. Mother's caseworker also encouraged her to look in Paola for housing and employment opportunities. But without regular transportation to and from Paola, Mother wanted to remain in Osawatomie, where she worked.

Mother moved out of the apartment she shared with Father in January 2020. At that time, the case had been pending for about 18 months. But DCF had previously removed her new roommate's children as well, meaning M.O. and A.O. could not reintegrate into Mother's new residence. In March, Mother's caseworker took her to apply for apartments in Osawatomie and encouraged her to look outside the city. After reportedly looking for housing in the spring and summer, Mother signed a one-year lease for an apartment in Osawatomie, which she moved into in late August.

This delay in finding adequate housing impacted the children's bond with Mother. Until September 2020, when M.O. and A.O. began visiting Mother at her new apartment, she had weekly, hour-long visits with them at the Osawatomie DCF office, in Ottawa, or in the community. These limited visits led her caseworker to believe the children were much closer to their foster parents than to Mother.

Another task required Mother to take parenting classes and a parenting assessment. She completed some of these classes early in her case. In August 2019, DCF offered, and Mother accepted, an in-house referral to complete the classes and assessment elsewhere, but due to a change in contractors, that referral was not made until December. Mother completed the classes in February 2020, the assessment in April, and her caseworker received the assessment report in June.

Finally, therapy was added to Mother's case plan tasks. Mother's initial 2018 mental health assessment recommended therapy, but it was not added to her case plan, and she did not know about the recommendation. That requirement was added based on the reports from Mother's parenting assessment and her second mental health assessment, completed in July 2020. Despite reminders from her caseworker, Mother did not take any action on this request until early October 2020, shortly after the State filed its termination motion.

Following the evidentiary hearing, the district court terminated Mother's parental rights, finding Mother unfit under K.S.A. 2020 Supp. 38-2269(b)(8) for demonstrating a lack of effort in adjusting her conduct. The court explained that

- during the first 19 months (from July 2018 to January 2020), Mother prioritized addressing Father's drug use over reintegrating her children;

4

- she did not seriously consider housing and employment opportunities in Paola and required reminders from her caseworker to submit housing applications;

- she completed her parenting assessment and classes because DCF offered alternative resources, not because she pursued them; and

- despite being aware of her anxiety, she waited approximately three months and required reminders before beginning therapy.

Though the court found Mother substantially completed her case plan, it determined she had not prioritized her children during the pendency of the case. And based on her children's ages and Mother's limited visits with them, the court concluded that termination was in their best interests. Mother appeals.

DISCUSSION

Parents have a constitutionally protected liberty interest in the relationship with their child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Thus, before terminating parental rights, a district court must find the State has proven the parent is unfit, the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future, and termination of parental rights is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(a), (g)(1). Due to the fundamental nature of this right, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 2020 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

5

A district court must first determine whether a parent is unfit—both at the time of the termination hearing and for the foreseeable future. Because children experience the passage of time differently than adults, "foreseeable future" must be viewed from the child's perspective. *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009); see K.S.A. 2020 Supp. 38-2201(b)(4). When reviewing a finding of parental unfitness, this court must determine, after considering all the evidence in a light favoring the State, whether the State proved its case by clear and convincing evidence—that is, whether a rational fact-finder could have found it highly probable that the parent is unfit. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

After finding a parent unfit, the district court must determine if termination of parental rights is "in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). This assessment gives "primary consideration to the physical, mental and emotional health of the child" and involves weighing termination against the parent's continued presence. K.S.A. 2020 Supp. 38-2269(g)(1); *In re K.R.*, 43 Kan. App. 2d 891, Syl. ¶ 7, 233 P.3d 746 (2010). Because determining what is in a child's best interests is inherently a judgment call, we will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds the broad latitude it is afforded if it rules in a way no reasonable person would have under the circumstances, ignores controlling facts or relies on unproven factual representations, or acts outside the appropriate legal framework. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

1. *The State proved Mother's unfitness by clear and convincing evidence.*

K.S.A. 2020 Supp. 38-2269(b) contains a nonexhaustive list of factors indicative of unfitness, any one of which is sufficient to support a finding that a person is not a fit

6

parent. K.S.A. 2020 Supp. 38-2269(b), (f). The district court found Mother unfit under K.S.A. 2020 Supp. 38-2269(b)(8) for demonstrating a lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of the children.

Mother argues clear and convincing evidence does not support the court's decision. She notes that even the district court found she had substantially completed her case plan when the termination hearing was held. And though she did not begin therapy immediately, the State presented no evidence that her anxiety prevented her from parenting her children.

When assessing a parent's fitness, the manner of completing the case plan tasks may be as important as the fact of completion. Here, Mother substantially completed her case plan but did so only after several lengthy delays and receiving repeated reminders. Mother ultimately found adequate housing. But she did so only after remaining with Father for most of the case. It took six months after beginning her housing search in mid-2019 to find a separate place to live. When her roommate's background rendered reintegration unsuitable in that house, she needed an additional six months to find her current apartment. And Mother required continued support from her caseworker to make these transitions. Similarly, Mother needed reminders to begin attending therapy several months after learning of the recommendation. And she resumed parenting classes only after she was offered a referral to another location.

These delays, present throughout the case, reflect a sense of complacency in completing these tasks and addressing her needs. And because completing these tasks was necessary to reintegrate with her children, they also suggest a lack of effort and motivation in meeting and responding to her children's needs. Granted, not all tasks support this finding; Mother never tested positive for drugs, and early in her case, she found a job, completed her first mental health assessment, and began parenting classes. But appellate courts cannot reweigh the evidence or reassess witnesses' testimony.

7

Viewing the evidence in a light most favorable to the State, the evidence is sufficient to support the district court's finding that it was highly probable that Mother did not make timely efforts to adjust her conduct and circumstances so she could meet her children's needs. This is not to diminish Mother's progress; her substantial completion of her case plan is certainly commendable. But the delays—particularly in finding adequate housing and in failing to act on the need for therapy more than two years into the pending case—and the need for reminders raise serious questions about her ability to change her conduct and circumstances to address her children's needs.

Likewise, the evidence indicates Mother's conduct will not change in the foreseeable future. Delays and the need for reminders and encouragement, particularly concerning housing, occurred throughout the case. And her recent delays in seeking therapy demonstrate that this behavior has not been adjusted. Based on the ages of M.O. and A.O., this record strongly suggests the conduct will continue. *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 944 (2019) ("[O]ur courts may look to the parent's past conduct as an indicator of future behavior.").

Viewing the record in the light most favorable to the State, as our reviewing posture demands, we conclude the evidence is sufficient to support the district court's findings that Mother did not adjust her circumstances and conduct to meet her children's needs, and the pattern of behavior that gave rise to this unfitness will remain for the foreseeable future.

2. *The district court did not abuse its discretion in analyzing the best interests of the children.*

Mother also asserts the district court abused its discretion in finding termination was in the children's best interests. She primarily argues DCF hindered her ability to bond with her children by only allowing hour-long visits.

The district court did not abuse its discretion. M.O. and A.O. were very young when taken into State custody. At the termination hearing, they had lived away from Mother for nearly 30 months. And Mother's caseworker explained they had a greater bond with their foster parents than with Mother. Given M.O. and A.O.'s need for stability, their limited contacted with Mother throughout the case, and the strength of the bond with their foster parents when compared to their bond with Mother, a reasonable person could find terminating Mother's parental rights was in the children's best interests. Balancing these interests, the district court did not abuse its discretion when it terminated Mother's parental rights.

Affirmed.